# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| | : | |
| CONEX HOLDINGS, LLC, et al. | : | Case No. 11-10501(CSS) |
| | : | |
| Debtors. | : | Jointly Administered |
| _____ | : | |
| | : | |
| CHARLES A. STANZIALE, JR., in his | : | |
| capacity as the Chapter 7 Trustee of | : | |
| Conex International, LLC, f/k/a | : | |
| Conex International Corporation, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Adv. Proc. No. 12-51211(CSS) |
| v. | : | |
| | : | |
| SOUTHERN STEEL & SUPPLY, L.L.C., | : | |
| | : | |
| Defendant. | : | |

## OPINION[1]

**BUCHANAN INGERSOLL & ROONEY PC**
Geoffrey G. Grivner
919 N. Market Street, Suite 1500
Wilmington, DE 19801
    -and-
JONES WALKER LLP
Mark A. Mintz
201 St. Charles Avenue, Suite 4900
New Orleans, Louisiana 70170

Counsel for Defendant Southern Steel, LLC

**McCARTER & ENGLISH, LLP**
Katharine L. Mayer
405 N. King Street, 8th Floor
Wilmington, DE 19801
    -and-
Michael J. Reynolds
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102

Counsel to Plaintiff, Charles A. Stanziale, Jr., the Chapter 7 Trustee

---

[1] Under Federal Rule of Civil Procedure 52(a)(3), made applicable by Federal Rule of Bankruptcy Procedure 7052, the Court is not required to state findings or conclusions when ruling on a motion under Federal Rule of Bankruptcy Procedure 7056.

Dated:  October 14, 2014

Sontchi, J. _Clfohn Shti_

## INTRODUCTION

Before the Court is a motion for summary judgment filed by creditor/defendant, Southern Steel & Supply, L.L.C., for a determination that six preferential transfers paid to it by the debtor, which constituted the totality of the parties' relationship, qualify for the ordinary course of business defense.  The Chapter 7 trustee has filed a cross-motion for summary judgment, arguing that the creditor does not qualify for the ordinary course of business defense.

Southern Steel's motion for summary judgment will be denied.  Southern Steel has not met its burden under the summary judgment standard of proving by a preponderance of the evidence that the transfers fall under the ordinary course of business defense.  Under the defense, an otherwise preferential transfer cannot be avoided if "such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was (A) made in the ordinary course of business of the debtor and transferee, or (B) made according to ordinary business terms."  The statute is written in the disjunctive and only one element need be proven to insulate the transfer from avoidance.

While the transfers appear to be avoidable under section 547(b) and incurred in the ordinary course of business, Southern Steel has not effectively shown the applicability of either prong of the defense.  But, the record is also insufficient to support the Trustee's

motion for summary judgment that the transfers were definitively **not** made in the ordinary course of business nor according to ordinary business terms.

At the end of the day, there is a genuine issue of material fact as to the applicability of the ordinary course of business defense that will need to be decided after a trial on the merits.  Thus, both motions will be denied with prejudice.

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F) and this Court has the judicial power to enter a final order.

## STATEMENT OF FACTS

The collective debtors, Conex Holdings, LLC, Conex International, and Advantage Blasting & Coating, Inc. (together, "Debtor" or "Conex"),[2] were placed into involuntary bankruptcy under Chapter 7 of the Bankruptcy Code by three petitioning creditors on February 20, 2011.[3]   An adversary proceeding was filed by the Chapter 7 Trustee ("Trustee" or "Plaintiff") against Southern Steel & Supply, L.L.C. ("Southern Steel" or "Defendant") to avoid and recover several preferential transfers under 11 U.S.C §§ 547 and 550, as well as to delay or disallow any preferential transfer claims made, pursuant

---

[2] Adv. Pro. 12-51211, D.I. 1, ¶ 9.

[3] Del. Bankr. 11-10501, D.I. 1. The involuntary petitions were filed on February 20th.  An order for relief under Chapter 7 was entered on February 24, 2011. D.I. 21.  Under 11 U.S.C. §547(b)(4)(A) and (f), the applicable preference period is the 90 days prior to the filing of the petition, i.e., November 22, 2010 through February 19, 2011.

to 11 U.S.C. § 502(d).[4]  The complaint alleges that the Debtor made certain preferential transfers to, or for the benefit of, the Defendant in the aggregate amount of $203,864.87, within 90 days prior to the Petition Date.[5]

All six of the transfers occurred during the preference period - between December 2, 2010 to February 10, 2011.[6]  While five of the payments were under $15,000.00, the last check was for the sum of $166,020.69.[7]  Each of the payments were meant to cover multiple late invoice payments, but no invoice was allegedly more than sixty days past due when paid.[8]  The Debtor had no previous dealings with Southern Steel outside of these six payments.[9]

According to Southern Steel's motion for summary judgment, however, these payments were made within the ordinary course of business, a valid defense against preferential transfers under 11 U.S.C. § 547(c)(2).[10]  Southern Steel alleges that it regularly engaged in the selling of pipe and other similar materials to businesses like Conex, and Conex, operating in the construction industry, regularly purchased supplies from

---

[4] Adv. Pro. 12-51211, D.I. 1.  Unless otherwise noted, all further docket references are to this adversary docket, which is the subject of this motion.

[5] *Id.*, ¶¶ 18-19.

[6] D.I. 1, Exh. A provides a schedule of payments which have occurred between the parties.  The dates on which checks were issued are as follows: December 2 and December 9, 2010, as well as on January 6, January 21, January 24, and February 7, 2011.

[7] *Id.*

[8] D.I. 38, pp. 4-5. *See also* Exh. 1, Affidavit of John Alford, ¶ 20.

[9] D.I. 38, p. 4 ("… the payments at issue, the only transactions as between Southern Steel and the Debtor, included the following six (6) payments totaling $203,864.87."). *See also* Exh. 1, Affidavit of John Alford, ¶¶ 11, 13 ("[This] project was the first and only project on which Southern Steel provided materials to Conex . . . The entire relationship between the parties was conducted during the preference period.").

[10] D.I. 38.

companies such as Southern Steel.[11]  Although the Debtor had a consistent pattern of late

payment, this late payment was acceptable to Southern Steel,[12] and was common in the

construction industry.[13]  Consequently, Southern Steel is able to meet both the subjective

and objective tests of the ordinary course of business defense, making the transfers

unavoidable.[14]

In opposition, the Trustee has filed a cross-motion for summary judgment, arguing

that Southern Steel is unable to meet either the subjective or objective tests of the ordinary

course of business defense.[15]  The Trustee argues that because the dealings between

Southern Steel and the Debtor all occurred during the preference period, the subjective

test of the ordinary course defense is entirely unavailable to the Defendant.[16]

Additionally, seeing as all payments were made late, and therefore outside the terms of

the parties' contractual arrangements, the payments are presumptively not ordinary.[17]

The Trustee further asserts that the Defendant is unable to establish a defense under the

objective prong, as there has not been an extensive and exacting analysis of industry

standards.[18]  According to the Trustee's professionals, most of the payments fell beyond

---

[11] *Id.,* p. 2.

[12] *Id.,* pp. 2, 11-12.

[13] *Id.,* p. 13.

[14] *Id.,* pp. 8-13.

[15] D.I. 40, pp. 5-9.

[16] *Id.,* pp. 6-7.

[17] *Id.,* p. 7.

[18] *Id.,* pp. 8-9.

industry lateness standards, which creates, if nothing else, a genuine issue of material fact on the issue.[19]

The Defendant filed a subsequent reply, alleging flaws in the Trustee's arguments.[20]  First, the Trustee has not provided any evidence for his own expert analyses, yet the data does show that the payments fall within the ordinary course of business within the industry.[21]  Second, there have been several circuit courts which have recognized that transactions occurring for the first time within the preference period remain eligible for the ordinary course of business defense.[22]  Finally, despite that performance was not in conformance with the express terms of the contract, the parties' consistent pattern of performance established that late payments were acceptable in the ordinary course of dealings.[23]

## DISCUSSION

A.    Legal Standard: Summary Judgment

Federal Rule of Civil Procedure 56(c), made applicable to adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment should be granted if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law,"[24] after

---

[19] *Id.*, p. 9.

[20] D.I. 42.

[21] *Id.*, pp. 1-2.

[22] *Id.*, pp. 3-4.

[23] *Id.*, pp. 5-7.

[24] Fed. R. Civ. P. 56(a).

considering the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits."[25]

In deciding a motion for summary judgment, all factual inferences must be viewed in the light most favorable to the nonmoving party.[26]   After sufficient proof has been presented to support the motion, the burden shifts to the nonmoving party to show that genuine issues of material fact still exist and that summary judgment is not appropriate.[27] A genuine issue of material fact is present when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[28]

In order to demonstrate the existence of a genuine issue of material fact in a jury trial, the nonmovant must supply sufficient evidence, not mere allegations, for a reasonable jury to find for the nonmovant.[29]   The same principles apply in a bench trial where the judge is the ultimate trier of fact; the nonmovant must obviate an adequate showing to the judge to find for the nonmovant.[30]   In a situation where there is a complete failure of proof concerning an essential element of the nonmoving party's case, Rule 56(c) necessarily renders all other facts immaterial and mandates a ruling in favor of the moving party.[31]

---

[25] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[26] *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–588 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

[27] *Id.* at 587.

[28] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[29] *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996).

[30] *In re Broadstripe, LLC*, 444 B.R. 51, 76-77 (Bankr. D. Del. 2010) (citing *Leonard v. General Motors Corp. (In re Headquarters Dodge)*, 13 F.3d 674, 679 (3d Cir. 1993)).

[31] *Id.* at 77-78 (citing *Celotex Corp.*, 477 U.S. at 317-18).

B.    Avoidable Transfers

Under 11 U.S.C. § 547(b), Congress "broadly authorized bankruptcy trustees to 'avoid any transfer of an interest of the debtor in property' *if* five conditions are satisfied and *unless* one of seven exceptions defined in subsection (c) is applicable."[32] The five required conditions are listed in § 537(b)(1)-(5), as follows:

> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made—
>
> > (A) on or within 90 days before the date of the filing of the petition; or
> >
> > (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if—
>
> > (A) the case were a case under chapter 7 of this title;
> >
> > (B) the transfer had not been made; and
> >
> > (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Unless each and every one of these elements is proven, a transfer is not avoidable as a preference under 11 U.S.C. § 547(b).[33]  In addition, 11 U.S.C. § 547(g) places the burden of proof for these elements on the Trustee.

---

[32] *Union Bank v. Wolas*, 502 U.S. 151, 154 (1991) (italics in original).

[33] *Waslow v. The Interpublic Group of Cos., Inc. (In re M Group, Inc.)*, 308 B.R. 697, 700 (Bankr. D. Del. 2004); *In re IT Grp., Inc.*, 331 B.R. 597, 601 (Bankr. D. Del. 2005).

First, § 547(b)(1) requires that the transfer be "to or for the benefit of a creditor." This requirement has been loosely construed by the courts.[34]  The Code defines a creditor as an "entity that has a claim against the debtor";[35] a "claim" as a "right to payment"[36]; and a "payment" as a "performance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation."[37]

Second, Section 547(b)(2) requires that the transfer be "for or on account of an antecedent debt" owed by the Debtor before such transfer was made.   A debt is antecedent for the purposes of Section 547(b) if it was incurred before the debtor made the allegedly preferential transfer.[38]  In addition, a debt is deemed to have been incurred "on the date upon which the debtor first becomes legally bound to pay."[39]

Third, a debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition, pursuant to 11 U.S.C. § 547(f).

Fourth, any preferential transfer must also occur within the voidable preference period within 90 days before the date of the filing of the petition, or within one year if transfers were made to company insiders.

Fifth, an avoidable transfer must enable a creditor to receive more than if the transfer had not been made, and if the creditor received payment of such debt to the

---

[34] *In re CVEO Corp.,* 327 B.R. 210, 214 (Bankr. D. Del. 2005).

[35] 11 U.S.C. § 101(10).

[36] *Id.*

[37] *In re Bake–Line Grp., LLC,* 359 B.R. 566, 577 (Bankr. D. Del. 2007) (quoting BLACK'S LAW DICTIONARY 1165 (8th ed. 2004)).

[38] *Peltz v. New Age Consulting Servs., Inc.,* 279 B.R. 99, 102 (Bankr. D. Del. 2002).

[39] *Id. Accord In re CVEO Corp.,* 327 B.R. at 214.

extent provided by the provisions of Title 11.  The Supreme Court has held that whether a particular transfer is preferential should be determined "not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results."[40]  The relevant inquiry for the Court is whether Southern Steel would have received a 100 percent payout in a Chapter 7 liquidation.[41]  If so, no preference can be recovered; if not, the requirements of Section 547(b)(5) are met.[42]  As a matter of general arithmetic, any transfer to a general unsecured creditor ordinarily satisfies this test unless the debtor's estate turns out to be solvent in Chapter 7.[43]

Here, it is not disputed that the transaction was to or for the benefit of a creditor, Southern Steel, and was made for or on account of an antecedent debt owed by the debtor before the transfers was made.[44]  Southern Steel is alleged to have provided pipe and other materials to Conex for incorporation into its refinery expansion project, at the

---

[40] *Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 229 (1936).

[41] *See In re Vaso Active Pharm., Inc.*, 500 B.R. 384, 394 (Bankr. D. Del. 2013) ("The resulting analysis therefore requires that in determining the amount that the transfer 'enables [the] creditor to receive,' such creditor must be charged with the value of what was transferred plus any additional amount that he would be entitled to receive from a Chapter 7 liquidation: 'The net result is that, as long as the distribution in bankruptcy is less than one-hundred percent, any payment "on account" to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made.'") (quoting *In re Lewis W. Shurtleff, Inc.*, 778 F.2d 1416, 1421 (9th Cir. 1985)); *In re AmeriServe Food Distribution, Inc.*, 315 B.R. 24, 32 (Bankr. D. Del. 2004); *Matter of Total Technical Servs., Inc.*, 150 B.R. 893, 903 (Bankr. D. Del. 1993).

[42] *See In re AmeriServe*, 315 B.R. at 32.

[43] George M. Treister et al., FUNDAMENTALS OF BANKRUPTCY LAW § 4.03(c)(1)(G)  (6th ed. 2006).

[44] D.I. 38, p. 4 ("…Southern Steel provided certain pipe and other materials to Conex for incorporation into the project . . . Southern Steel avers that these materials were supplied to Conex on open account under ordinary and standard payment terms to be paid pursuant [sic] six (6) separate invoices.")

Debtor's request and according to ordinary and standard payment terms.[45] The evidence provided contains invoices for such materials issued to the Debtor, and each of the payments made by the Debtor has been shown to correspond to multiple issued invoices.[46] As the transfers between the Debtor and Southern Steel began on December 2, 2010,[47] all six of transfers were made within 90 days before the date of the filing of the Debtor's bankruptcy petition (filed on February 20, 2011), and, thus, were made while the debtor was insolvent. Lastly, it remains highly unlikely that the Debtor's estate will turn out to be solvent within Chapter 7 liquidation, as the company was brought into involuntary bankruptcy by several creditors. Although the pleadings for this element remain limited, and to some extent conclusory, the record provided to the Court has indicated that Southern Steel would receive less than one hundred percent of its claim in the liquidation. Each element of Section 547(b) has therefore been satisfied, making the six payments to Southern Steel avoidable transfers.

      C.    <u>Ordinary Course of Business Defense</u>

Even if a transfer satisfies all the elements of § 547(b), it nevertheless may not be avoided if the opposing party proves that the transfer satisfies one of the exemptions listed in Section 547(c).[48] The party contending that the transfer falls under one of the exemptions bears the burden of proving that assertion by a preponderance of the

---

[45] *Id.*, Exh. 1, Affidavit of John Alford, ¶¶ 7-12.

[46] *Id.*, Exh. 1, Affidavit of John Alford, ¶¶ 14-17. To some extent, these two factors have also been admitted by Southern Steel in response to Plaintiff's Request for Admission. *See* D.I. 41, Exh. C, pp. 3-5.

[47] D.I. 38, Exh. A.

[48] *Archway Cookies*, 435 B.R. at 240 (citing *In re M Grp., Inc.*, 308 B.R. 697, 701 (Bankr. D. Del. 2004)).

evidence.[49]  Section 547(c)(2) permits a "safe harbor" for preferential transfer payments if "such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was (A) made in the ordinary course of business of the debtor and transferee, or (B) made according to ordinary business terms."[50]

Here, it is not disputed that the transfer was in payment of a debt incurred by the Debtor in the ordinary course of business or financial affairs of the Debtor and the transferee.  It is alleged that the Debtor operated as a general industrial contractor, and was in need of building materials from companies like Southern Steel for a refinery expansion project.  Similarly, at the Debtor's request, Southern Steel provided pipe and other materials to Conex, and it regularly sold such materials to companies like Conex for use in construction projects.[51]

Accordingly, the Court is left to determine whether any or all of the transfers were made in the ordinary course of business of the Debtor and Southern Steel, or made according to "ordinary business terms."  The statute is written in the disjunctive and only one element need be proven to insulate the transfer from avoidance.  But, prior to 2005, the statute was more stringent and the defendant had to establish both that the transfer

---

[49] See 11 U.S.C. § 547(g). See also In re First Jersey Sec., Inc., 180 F.3d 504, 512 (3d Cir. 1999) ("The burden is on the transferee to satisfy each statutory element by a preponderance of the evidence.") (citing J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp., 891 F.2d 66, 69–70 (3d Cir. 1989)).

[50] In re Am. Home Mortgage Holdings, Inc., 476 B.R. 124, 135 (Bankr. D. Del. 2012) (citing 11 U.S.C. § 547(c)(2)(A)–(B)) (internal quotations omitted).

[51] D.I. 38, Exh. 1, Affidavit of John Alford, ¶¶ 7-11. See also D.I. 40, pp. 1-3. For a similar precedent, see Archway Cookies, 511 B.R. at 241.

was made in the ordinary course of business and under industry norms.[52]   This distinction is important in reading the applicable case law, which is in conflict with the current statutory language.

1.   *Ordinary Course of Business of the Debtor and Transferee*

The determination of whether a creditor has met its burden under section 547(c)(2)(A) is a subjective test, "calling for the Court to consider whether the transfer was ordinary as between the debtor and the creditor."[53]   Courts have considered a myriad of factors in this test, including: (1) the length of time the parties engaged in the type of dealing at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether the payments at issue were tendered in a manner different from previous payments; (4) whether there appears to have been an unusual action by the debtor or creditor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage (such as additional security) in light of the debtor's deteriorating financial condition.[54]   No one factor is determinative.[55]   To determine whether transfers

---

[52] Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 §409 (Apr. 20, 2005).   *See also* the 2005 House Report ("Section 409 amends section 547(c)(2) of the bankruptcy Code to provide that a trustee may not avoid a transfer to the extent such transfer was in payment of a debt incurred by the debtor in the ordinary course of the business or financial affairs of the debtor and the transferee and such transfer was made either: (1) in the ordinary course of the debtor's and the transferee's business or financial affairs; or (2) in accordance with ordinary business terms.  Present law requires the recipient of a preferential transfer to establish both of these grounds in order to sustain a defense to a preferential proceeding.").  The change in the statute was applicable only to cases filed on or after October 17, 2005.

[53] *First Jersey Sec., Inc.*, 180 F.3d at 512 ("…[T]he determination of what is 'in the ordinary course of business' is subjective, calling for the Court to consider whether the transfer was ordinary as between the debtor and the creditor.")

[54] *Am. Home Mortgage.*, 476 B.R. at 135-36 (citing *Archway Cookies*, 435 B.R. at 242; and *In re Hechinger Inv. Co. of Delaware, Inc.*, 320 B.R. 541, 548–49 (Bankr. D. Del. 2004)).

[55] *Burtch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.)*, 463 B.R. 302, 306 (Bankr. D. Del. 2010).

13

were in the ordinary course of business the Court must first determine what the ordinary course of business was and then compare the preferential transfers to it.[56]

In situations where the parties have a long history of dealings, the focus in determining the ordinary course of the parties' business is on those dealings.  But, what if the parties have a short history of dealings?  While at least one court has articulated a *per se* rule that the ordinary course of business defense cannot be used at all if the first transfer between the parties occurs during the preference period,[57] the Sixth, Seventh, and Ninth Circuits, the Tenth Circuit's Bankruptcy Appellate Panel, and bankruptcy courts within this circuit, have instead held that a first-time transaction between a debtor and a creditor may still qualify as an ordinary course transaction for the purposes of Section 547(c)(2).[58]

In order to deal with the problem of determining whether one or a few transactions can establish an ordinary course of business between the parties, courts have required the creditor in such instances to fill the "gap" by reference to a more extensive and

---

[56] *Id.*

[57] *See, e.g., In re Brown Transp. Truckload, Inc.*, 152 B.R. 690, 692 (Bankr. N.D. Ga. 1992).

[58] *See In re Finn*, 909 F.2d 903, 908 (6th Cir. 1990) ("Obviously every borrower who does something in the ordinary course of her affairs must, at some point, have done it for the first time. We hold that, as a general rule, subject to the individual fact-finding powers of the district court in a specific inquiry, a transaction can be in the ordinary course of financial affairs even if it is the first such transaction undertaken by the customer."); *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 642-43 (7th Cir. 2003) ("Although a history of dealing between parties is certainly the strongest factor supporting a determination that the business between a debtor and an alleged preference creditor is ordinary, we do not believe it is absolutely necessary in every case."); *In re Ahaza Sys., Inc.*, 482 F.3d 1118, 1125 (9th Cir. 2007); *In re Tulsa Litho Co.*, 232 B.R. 240, 247 n. 6 (Bankr. N.D. Okla. 1998), *aff'd*, 229 B.R. 806 (B.A.P. 10th Cir. 1999). *See also In re Forman Enterprises, Inc.*, 293 B.R. 848, 857 (Bankr. W.D. Pa. 2003); *In re Quad Sys. Corp.*, No. 00-35667F, 2003 WL 25947345, at *9 (Bankr. E.D. Pa. July 15, 2003).

exacting analysis of industry standards.[59]   That would require an objective analysis, comparing the transactions between the debtor and the creditor to others in the industry. The defendant would be required to establish an industry standard, an agreed practice and manner of payment among its competitors, and the defendant must then show that the payments at issue fit within this standard.[60] It has been held that "[t]his is especially important where payments are late."[61]

The Third Circuit has detailed:

[W]hen the relationship in question has been cemented long before the onset of insolvency-up through and including the preference period-we should pause and consider carefully before further impairing a creditor whose confident, consistent, ordinary extension of trade credit has given the straitened debtor a fighting chance of sidestepping bankruptcy and continuing in business. Bankruptcy policy, as evidenced by the very existence of § 547(c)(2), is to promote such continuing relationships on level terms, relationships which if encouraged will often help businesses fend off an unwelcome voyage into the labyrinths of a bankruptcy . . . On the other hand, where the relationship is of recent origin, a significant departure from credit terms normal to the trade bears the earmarks of favoritism and/or exploitation, and to countenance such behavior could be unfair (or could appear unfair) to the remaining creditors who exhibit the virtue of patience . . .

When the relationship between the parties is of recent origin, or formed only after or shortly before the debtor sailed into financially troubled seas, the credit terms will have to endure a *rigorous comparison to credit terms used generally in a relevant industry.* That is because in that class of cases we lack something better to look at to verify that the creditor is not exploiting the debtor's precarious position at the brink of bankruptcy so that it may advantage itself to the detriment of other creditors who continue to extend credit within the letter and spirit of the Code . . . [T]here is no baseline against which to compare the pre-petition transfers at issue to

---

[59] *In re Forklift LP Corp.*, 340 B.R. 735, 739 (D. Del. 2006); *In re U.S. Interactive, Inc.,* 321 B.R. 388, 392–93 (Bankr. D. Del. 2005).

[60] *U.S. Interactive*, 321 B.R. at 392.

[61] *Id.*

confirm the parties would have reached the same terms absent the looming bankruptcy . . .

It might be said that this rule favors longstanding creditors over new ones, and that as a result a business teetering on insolvency would experience difficulty obtaining trade credit from new sources. But we find it unlikely that a creditor aware of a debtor's financial instability/insolvency would agree to extend credit in the first place. Should the creditor wish to do so anyway . . . [the court] notes that [this] interpretation only mandates that the creditor ensures its credit terms comport with some reasonably relevant industry's norms. Were it otherwise, it might appear that the creditor is simply trying to accommodate the debtor's precarious financial condition or to strike itself a superior deal at the expense of a frail debtor, causing the transfer to lose its flavor of normalcy.[62]

The problem, however, is that this case law was developed at a time when the defense required a showing that the transfer was **both** in the ordinary course of the parties' relationship **and** under industry norms. Thus, it was logical to require a more stringent showing of the second factor of a two-part test when evidence relating to the first part of the test was incomplete or absent. But, there is no longer a two-part test. Since the amendment of the statute in 2005 under BAPCPA, the elements have been independent. To require a defendant to show that transfers were made under industry norms to establish that the transfers were made in the ordinary course of the parties' relationship would be to rewrite the statute to its pre-2005 terms.[63] To be consistent with the current statutory structure, the Court cannot import the industry practice into its

---

[62] *Molded Acoustical Products*, 18 F.3d at 224-26 (citations omitted) (emphasis added).

[63] *See In re National Gas Distributors, LLC*, 346 B.R. 394, 403 (Bankr. E.D.N.C. 2006) (noting that the link between the "ordinary course of business" and the "ordinary business terms" components of § 547(c)(2) has been removed by BAPCPA). The court in *National Gas Distributors* goes on, however, to use the change from the conjunctive to the disjunctive as a basis to redefine the meaning of "ordinary business terms." That holding has been criticized. *See, e.g., In re American Camshaft Specialties, Inc.*, 444 B.R. 347, 364 (Bankr. E.D. Mich. 2011).

review of the parties' business relationship.[64]  The Court must do the best it can with the evidence before it as to the parties' relationship.  Moreover, under the current statute it would be inappropriate to subject the evidence of industry norms to stricter scrutiny because the parties' business relationship has been for a relatively short time.[65]

Here, the relationship between Southern Steel and the Debtor began within the preference period of 90 days before the bankruptcy petition was filed.  It therefore becomes impossible for the Court to compare the transfers that occurred to any transfers in a pre-preference or historical period.  Yet there does not appear to have been any unusual action by Southern Steel or the Debtor to collect on or to pay the debt, respectively, with the exception of the last payment, which was large.  The last payment totaled the sum of $166,020.69, in contrast to the other five payments which were for amounts under $15,000.[66]  The allegations also do not speak to Southern Steel taking any

---

[64] While many courts, including this one (*see In re Am. Home Mortgage*, *supra*), have applied pre-2005 law to interpret the ordinary course of business and ordinary business terms defenses, none have dealt with this precise issue – whether to apply the pre-2005 law that states that in determining whether one or a few transactions can establish an ordinary course of business between the parties, the creditor must fill the "gap" by reference to a more extensive and exacting analysis of industry standards.  *Accord In re Waterford Wedgwood USA, Inc.*, 508 B.R. 821, 831 (Bankr. S.D.N.Y. 2014) (rejecting plaintiff's conflation of sections 547(c)(2)(A) and (B), finding that plaintiff "appears to be advocating for a return to the pre-BAPCPA test, when a successful defense under Section 547(c)(2) required a creditor to prove not only that the transfer was made in the ordinary course of business between the debtor and transferee, but also that it was made according to ordinary business terms (i.e., both the subjective and objective elements). But the statutory language of the BAPCPA amendments is clear. Congress made the test disjunctive, allowing a defendant to prevail by proving either the subjective test under Section 547(c)(2)(A), or the objective test under Section 547(c)(2)(B).  If Congress intended to add a subjective component to Section 547(c)(2)(B) or to somehow make it more difficult for a creditor to prevail under the subsection, it could easily have done so. Instead, Congress simply changed one word—"and" to "or"—and left the wording of the subparts unchanged.") (internal citations omitted).

[65] Whether Southern Steel has established that the parties' business relationship is consistent with industry standards will be discussed later, in conjunction with the requirements of Section 547(c)(2)(B), in which the Court must objectively analyze industry standards.

[66] D.I. 1, Exh. A.

steps to gain any advantage, such as additional security, in light of the Debtor's

deteriorating condition.  In fact, Southern Steel asserts that over the course of its dealings

with the Debtor, Southern Steel "never demanded payment, changed payment terms, or

change[d] credit terms, either in writing or in a phone call" and its dealings with the

Debtor during the preference period have remained consistent. [67]

The Trustee opines that payments that are late according to the terms of the

parties' contract are presumptively not ordinary under section 547(c)(2)(A).[68]  It is indeed

"well settled" in many jurisdictions that payments made beyond the payment terms are

considered as falling outside the ordinary course of business between the parties and are

presumed not to be ordinary.[69]  Notwithstanding this rule, however, such a presumption

can be rebutted if it is shown that late payments were the normal and ordinary practices

between the parties.[70]  Southern Steel thus attempts to argue that performance by both

---

[67] D.I. 38, Exh. 1, Affidavit of John Alford, ¶ 23.  It has been alleged by Southern Steel that the median time between the invoice date and the payment date was 31 days, that every payment was made within 25 days on either side of that median time frame, and that the Debtor never let any invoice get more than 60 days old.  D.I. 38, pp. 11-12

[68] D.I. 40, p. 7.  Elsewhere, the Trustee has also argued that the parties' express agreement furnishes the most informative evidence left to consider of the ordinariness of a transaction from the parties' perspective, meaning that if payments were made outside the terms contained in the parties' agreement, courts have automatically denied defendants the benefit of the ordinary course defense.  *Id.*, p. 6.  This strict rule, however, does not appear to be often applied. Even in the case of a single transaction between the parties, strict conformance to contract terms is not necessary in order to qualify for the ordinary business defense. *See, e.g., In re US Office Products Co.,* 315 B.R. 37, 40 (Bankr. D. Del. 2004) ("[A] late payment [according to the contract terms] in the context of a single transaction between parties may fall within the ordinary course provision of § 547(c)(2)(B).")

[69] *In re TWA, Inc. Post Confirmation Estate,* 327 B.R. 706, 709 (Bankr. D. Del. 2005).

[70] *Id.; In re Elrod Holdings Corp.,* 426 B.R. 106, 111 (Bankr. D. Del. 2010) ("Late payments do not preclude a finding that the payment occurred during the ordinary course of business; in fact, a pattern of late payments can establish an ordinary course between the parties."); *In re Big Wheel Holding Co., Inc.,* 223 B.R. 669, 674 (Bankr. D. Del. 1998) ("[L]ateness of payment does not preclude a finding that the payment was made in the ordinary course, and indeed a pattern of late payments can establish an ordinary course between the parties.").

parties under the contract "established a course of dealings . . . . [in which] late payments were tolerated, and that invoices would be paid thirty to sixty days after the invoice date."[71]

Yet here, late payments were not the normal and ordinary practice between the Debtor and Southern Steel.  The payment terms were "Net 30,"[72] but the median time between an invoice date and a payment date was 31 days.[73]  The first invoice was paid 23 days after the invoice was issued, the next seven invoices were paid one day after issue, and the following two only eight days past issue, meaning that none of the first ten invoices were paid late under the terms of the contract.[74]  The last eleven invoices, however, were all paid between 33 to 60 days after the date an invoice was issued, averaging 42 days. [75]  Seeing as the first ten invoices were paid within the payment terms, and only the last eleven payments made late, late payments cannot be considered as an ordinary practice between the two parties, despite the allegations otherwise.

This leads us to a fundamental problem with Southern Steel's position – the deficiency of the record it has put before the Court.  The calculations above have been based on Exhibit A attached to the Affidavit of John Alford, which is a chart depicting the six transfers, when they were paid, and the corresponding invoices which the

---

[71] D.I. 42, p. 6.

[72] D.I. 40, p. 7. *See also* D.I. 38, Exh. 1, Affidavit of John Alford, Exh. B (collection of invoices stating that the "Sub Terms" were "08 Net 30").

[73] D.I. 38, Exh. 1, Affidavit of John Alford, ¶ 21.

[74] *Id.,* Affidavit of John Alford, Exh. A (chart depicting the six transfers, when they were paid, and the corresponding invoices which the transfers were paying).

[75] *Id.*

transfers are paying. Yet there are several discrepancies within the Affidavit. First, with regard to the first ten invoices,[76] the invoice dates shown on the actual invoices provided do not correspond with the information provided within the "Invoice Dates" column in the chart. For instance, with regard to the first invoice, the chart lists the invoice date as November 9, but the invoice date on the attached evidence (Exhibit B to the Affidavit of John Alford) appears as October 21.[77] This seems out of the ordinary, and no explanation has been provided or hinted at by the parties. Second, despite being listed as an attached document under Section 16(a) of the Affidavit, no delivery ticket for Invoice No. 811727 has been provided. Third, an invoice and corresponding delivery ticket has been provided for Invoice No. 811891, in the amount of $121.80, but this invoice has not been shown on the chart. It remains possible that this invoice was never paid. Finally, and most importantly, supporting evidence has not been provided with regard to the last transfer of $166,020.69. Despite that Section 16(f) of the Affidavit specifically lists that evidence has been provided in Exhibit B-6, the exhibit does not contain a deposit report for $166,020.69, nor does it contain Invoice and Delivery Ticket No. 811899, nor any of the other items listed by the Affidavit. Instead, Exhibit B-6 merely repeats the data provided for the fourth transfer payment: the lockbox deposit report for a payment of $3,905.45 made on January 21, 2011, as well as three corresponding Invoice and Delivery Tickets.[78]

---

[76] Invoice Nos. 811458, 811644, 811647, 811669, 811702, 811707, 811727, 811738, 811643, and 811751.

[77] In other instances, the invoices have a date of December 1 listed on the chart, but the provided evidence has shown invoice dates of either November 17 or November 26.

[78] Invoice and Delivery Ticket Nos. 811828, 811843, 811844. Each of these has already been provided before, in Exhibit B-4.

Consequently, the Court lacks proof as to whether such an invoice for this large sum was ever issued by Southern Steel, or whether it was paid by the Debtor and should now be avoided, or allowed. Moreover, this is a motion for summary judgment and, as movant, Southern Steel cannot be given the benefit of the doubt.

Under the dates provided by the evidence, and not by following the Exhibit A chart, the first ten invoices were either paid 42 days after an invoice was issued, 15 days after issue, or six days after issue, meaning that there still lacks a consistent performance of late payment. Indeed, in reality, even fewer invoices were paid within 30 days of issuance than asserted in Mr. Alford's affidavit. In any event, the Court must construe the evidence in favor of the non-movant and, in that light, late payments cannot be considered as an ordinary practice between the two parties.

Ultimately, the requirements of section 547(c)(2)(A) have not been met. While there does not appear to be any unusual action by Southern Steel or the Debtor to collect on or pay the debt (with the exception of perhaps the last large payment), nor were there allegations of any advantages gained by Southern Steel in light of the Debtor's impending insolvency, these two factors alone are not enough to show that the payments occurred within the ordinary course of business between the Debtor and Southern Steel. Indeed, Southern Steel has failed to establish that there was any ordinary course of business between the parties. At the very least, Southern Steel has not established that it was in the ordinary course of the parties' business for invoices to be paid late. As the bulk of the payments by number and by amount were made late, they are presumed not to have been made in the ordinary course of business. Southern Steel, as the movant, has not sustained

its burden in proving that the transfers were made in the ordinary course of business of the debtor and the transferee.

### 2. *Accordance with Ordinary Business Terms*

The phrase "ordinary business terms" looks to general norms within the creditor's industry.[79]  As the Third Circuit has held, transfers may be avoided only if they are "so idiosyncratic as to fall outside that broad range" of practices customary in the creditor's industry.[80]  This Court and others within the Third Circuit have frequently characterized "ordinary business terms" as embracing a "broad range" of credit practices that are "in harmony with the range of terms prevailing as some relevant industry norms."[81]  While expert testimony is not necessarily required, a defendant must provide admissible, non-hearsay testimony related to industry credit, payment, and general business terms in order to support its position.[82]

In the past, however, the stringency of this standard has often been increased in situations where relationships between the debtor and creditor are of recent origin.[83]  As discussed above, requiring stricter scrutiny of industry norms because the parties have not had a long relationship is inconsistent with the current statute's structure.  Thus, the Court will review the evidence under the normal summary judgment standard.

---

[79] *Am. Home Mortgage Holdings*, 476 B.R. at 140.

[80] *Molded Acoustical Products*, 18 F.3d at 220.

[81] *Am. Home Mortgage*, 476 B.R. at 140-41 (citing *Forklift LP Corp.*, 340 B.R. at 739).

[82] *Hechinger Liquidation Trust*, 298 B.R. 240, 242 (Bankr. D. Del. 2003).

[83] See, e.g., *U.S. Interactive,* 321 B.R. at 393 (Due to the short course of dealing between the parties, which also occurred during the preference period, the Court's scrutiny of the parties' payment practice against the industry standard must be rigorous).

Southern Steel has sought to establish the industry standard through its expert, John Alford, the parent company's vice president, with nine years of experience in the construction industry.[84]  The affidavit provides that "[i]t is normal in the construction industry for parties to make payments between 30 to 60 days after the invoice date. It is not uncommon in the construction industry for parties to make payments up to 90 days after the invoice."[85]  In opposition, the Trustee points out that Mr. Alford does not describe his experience, explain which areas of the industry he has worked in, or state that he has even worked for more than one company, thus arguing that it is insufficient proof to establish an ordinary course defense under the objective test.[86]  The Trustee instead alleges that its professionals have performed an analysis of Southern Steel's business, "determin[ing] that Defendant's Standard Industry Code ('SIC') is 5051 . . . the marketing of semi-finished metal products.  For 2010, the industry median days sales outstanding ('DSO') was 39 days with an interquartile range of 33 to 43 days," and most of the payments made fell outside that range.[87]  No supporting data or reports, however, were provided to substantiate either parties' allegations.

Southern Steel has not met its burden of proof in providing the Court with enough information to determine the "ordinary business terms" in the industry.  "Courts have rejected evidence of an industry standard where it is too general.  Instead, courts look for

---

[84] D.I. 38, Exh. 1, Affidavit of John Alford, ¶ 20.

[85] *Id.*, ¶¶ 18-19.

[86] D.I. 40, p. 9.

[87] *Id.*

objective definitive evidence supported by specific data to meet the burden of proof."[88]

Within *U.S. Interactive,* Judge Walrath rejected testimony that was imprecise and which

did not provide any objective basis or statistical analysis for its conclusion.[89]   Although

witnesses who have worked in the company and in the industry may be prime candidates

for providing relevant testimony,[90] this testimony will also only be useful if "the court

determines that the employees are credible and have significant and relevant industry

experience."[91]   Within *In re Sacred Heart Hosp. of Norristown*,[92] the Bankruptcy Court in the

Eastern District of Pennsylvania rejected evidence which was "totally lacking in

specificity, consisting of merely broad estimates of a wide range of delay time in

payments (90 to 150 days)."[93]

Here, the evidence consists of mere undetailed allegations from Mr. Alford about

various acceptable ranges of payment dates in the construction industry, which, much

like the evidence provided within *U.S. Interactive,*  lack an objective basis or any statistical

---

[88] *U.S. Interactive*, 321 B.R. at 393 (citing *Advo–System, Inc. v. Maxway Corp.*, 37 F.3d 1044, 1051 (4th Cir. 1994)).

[89] *U.S. Interactive*, 321 B.R. at 393-94 ("The [d]efendant's expert did not present any statistics or other objective basis for his conclusions.  Further, he did not testify that 45, 50 or 60 days was, in fact, the payment terms in the industry, but only, a 'good target to shoot for.'  We conclude that this is insufficient to meet the Defendant's burden of proof to establish an ordinary course of business defense under section 547(c)(2)(C).").  Notwithstanding that the *U.S. Interactive* court applied a strict standard with which this Court disagrees, *see* p. 22, *supra*, its analysis of the nature of the evidence presented is relevant and helpful.

[90] *See In re Cherrydale Farms, Inc.*, No. 99-597, 2001 WL 1820323, at *5 (Bankr. D. Del. Feb. 20, 2001). Within *Cherrydale,* the Court accepted an affidavit from the company's CFO to determine the industry standard regarding earned commissions. The CFO drew on his own direct knowledge from many years of experience with the company and the industry, and no contrary evidence had been provided or even alleged. Notably, however, because of the long pre-insolvency period between the two parties in the case, the Court did not, and did not need to, extensively scrutinize industry standards against the parties' practices.

[91] *In re Global Tissue L.L.C.*, 106 F. App'x 99, 103 (3d Cir. 2004) (commenting on the result in *Cherrydale*).

[92] *In re Sacred Heart Hospital of Norristown*, 200 B.R. 114 (Bankr. E.D. Pa. 1996).

[93] *Id.* at 119.

analysis.  While Mr. Alford may have relevant and significant industry experience, details on his experience have not been described to the Court, except for a vague expression of his nine years of industry experience.  The errors and discrepancies that have been found in Mr. Alford's affidavit, discussed above, may also detract from his credibility.  Additionally, it is relevant that the Trustee has made contrary allegations on the subject matter for which Mr. Alford is testifying toward, even if such allegations remain unsupported by evidence at this time.

The Court must compare the transactions that did occur to the common credit terms and payment practices used in the relevant industry.  Southern Steel's scant evidence have not shown to the Court a reliable industry standard and, thus, the Court is unable to compare industry practices against the six disputed transactions. As such, Southern Steel has failed to meet its burden under section 547(c)(2)(B).

D.    Chapter 7 Trustee's Motion for Summary Judgment

The Chapter 7 Trustee's opposition also contains a cross-motion for summary judgment. The only relief the summary judgment motion requests, however, is a dispositive judgment that Southern Steel does not qualify for the ordinary business defense.  As a result, in order for the Court to grant the Trustee's cross-motion, the Trustee must prove by a preponderance of the evidence that Southern Steel does not qualify for the defense.  While the Court will deny Southern Steel's motion, this does not imply that the Trustee's cross-motion should be granted.  Indeed, because the pleadings on the two motions have converged, it is impossible to examine whether the Trustee's own arguments have proved by a preponderance of the evidence that Southern Steel does not,

and never can, qualify for the ordinary business defense.  A defendant's failure to achieve summary judgment on an affirmative defense does not necessarily render that defense unavailable at trial.[94]

## CONCLUSION

Southern Steel, as the party contending that the transfers fall under the ordinary business defense, has not met its burden in proving its contention by a preponderance of the evidence.  It has not demonstrated that the transfers were made in the ordinary course of business of the debtor and transferee, or made according to ordinary business terms.  In addition, the Chapter 7 Trustee has failed to meet his burden of showing the defense is unavailable.

At the end of the day, there is a genuine issue of material fact as to the applicability of the ordinary course of business defense that will need to be decided after a trial on the merits.  Consequently, Southern Steel's motion for summary judgment and the Trustee's cross-motion for summary judgment will both be denied with prejudice.

---

[94] For example, in *Sierra Concrete Design*, *supra*, the Court denied defendant's motion for summary judgment based on the ordinary course of business but the case proceeded to trial on the merits on, among other things, that defense.